WILLIAM A. FORCE & CO., Inc., v. BATES MACHINE CO.

(Circuit Court, E. D. New York. April 7, 1909.)

PATENTS (§ 328*) — VALIDITY AND INFRINGEMENT — MACHINE FOR ENGRAVING METAL BLANKS.

The Chase patent, No. 517,680, for a machine for engraving metal blanks, was not anticipated and discloses invention; nor is it void on the ground of prior public use of the machine, nor that the patentee was not the original inventor. Also, *held* infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. On final hearing.

William E. Warland, for complainant.
F. Warren Wright, for defendant.

CHATFIELD, District Judge. The complainant corporation has succeeded to the rights of one Henry A. Chase, who obtained letters patent No. 517,680, upon the 3d day of April, 1894, upon an application filed May 29, 1893, for what Chase called a new and useful improvement in machines for engraving characters upon metal blanks. Chase assigned the rights under his application, before the patent was issued, to a copartnership, which subsequently was incorporated, and the corporation thus formed took over this patent, among other assets, some time prior to the commencement of the action.

The defendant is a corporation which has been in a similar line of business to that of the complainant during nearly all the time with which the testimony in this action has to do. A third company, known as the "New York Stencil Works," was in business and had a factory in Brooklyn, from some time in the year 1887, until its plant was moved to New York in the year 1893. The Brooklyn factory of the New York Stencil Works was first located in Lexington avenue, and was moved to St. Marks avenue, according to the testimony of one Meyer, early in the year 1890. During these years from 1888 to 1892, one Joseph D. Mallonee was the superintendent and manager of the factory of the New York Stencil Works, and Henry A. Chase, who had previously worked for Mallonee, in Hartford, was brought, on August 1, 1898, to the factory on Lexington avenue, gradually being promoted until he was foreman or assistant to Mallonee, and continuing in that position until the month of July, 1891. At that time Mallonee had Chase arrested, upon the charge of taking patterns from the vaults of the New York Stencil Works and selling the information to rival concerns. The hearing resulted in the discharge of Chase by the police, and soon after Chase went into the employment of the complainant's firm, where he was located until the year 1893, when

———————————

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the transactions with relation to the taking out of the patent in suit occurred.

Meantime, and in the year 1892, around the month of October, Mallonee, who had then left the employment of the New York Stencil Works, constructed for the firm of Stewart & Company six engraving machines, of a style shown by certain drawings introduced in evidence, and almost exactly like the machines described in the Chase patent and manufactured and used by the complainant. Subsequently Mallonee made some other machines for Stewart & Co., then became engaged in other employments, and his whereabouts were not known to any of the parties to the suit until after the commencement of this action. As early as 1890, Stewart & Co. seem to have been furnishing wheels for what were called "Ajax" machines, which wheels were manufactured by the New York Stencil Works, and, according to the the testimony in the suit, seem to have been made by machine, in a manner similar to the methods of the complainant's patent. Evidence of the existence of such a product was given by one Willard W. Sawyer, who at the time of the trial of this action was foreman in the defendant's factory, and prior to that time had been the defendant in two actions brought by the present complainant for infringement of patent, in which suits the complainant seems to have been successful. In addition, the Bates Manufacturing Company, a corporation having an office in New York, was incorporated in September, 1890, and Edwin C. Bates, who had been manager of that company, was at the time of the trial president of the defendant herein, and litigation was also at that time existent between the Bates Manufacturing Company and the Bates Machine Company, the defendant herein.

It also appears by the testimony that difficulties arose in the New York Stencil Works, and that, at the time Mallonee left its employment, he filed a letter of resignation, in which he intimated that his relations with the company were satisfactory, and that he did not intend to engage in any competing business, while, according to his testimony in the suit, he left the company because he was unwilling to have further relations with the persons who had gained control. The minutes of the company show that questions were raised as to the legality of his actions as trustee and secretary, through his having held no stock in the company. It also appears from the record that Mallonee, in 1888, made a contract with the New York Stencil Works, by which all inventions and improvements made by Mallonee should be the property of the New York Stencil Works, and that no information regarding any machinery, method, or process of manufacture, in use by the New York Stencil Works, should be given to any one except on consent; while Mallonee testifies, in the course of the trial, that, until about the year 1889, he was under no contract obligation with respect to inventions and methods. He also testified upon the trial that he gave the information respecting the engraving machines, and built certain of these machines for Stewart & Co., in order that he might cause trade competition against the New York Stencil Works, and that he never attempted to patent the engraving machine in question, for the reason that he thought it better to keep the con-

struction of such a machine secret, and that he had been released from his agreement with the New York Stencil Works when he left their employ.

Mallonee produces a sketch of a machine similar to the design of the Stewart machines which were built in 1892, and identifies the drawings so produced as made by him in the early part of 1889, fixing this date by the place of his residence, and in this his wife gives some corroborating testimony as to events; but her testimony is not particularly persuasive as to the identity of the drawings and machines referred to.

The record also shows that some years later Chase, or a man by the same name, and who is partially identified by photograph, was imprisoned for a considerable period in the state prison at Weathersfield, Conn. This testimony was properly objected to by the complainant. Chase was not a witness in the case, his testimony and credibility were not at issue, and, inasmuch as the charge under which the man in Connecticut was imprisoned was for cohabiting with a woman not his wife, such testimony is illustrative only of the bad feeling existing between the various parties to the case, and can throw no light on whether he invented the machine in dispute.

The complainant brought its action charging infringement of the patent described. The defendant answered denying infringement, denying the validity of the patent on the grounds of anticipation, public use for more than two years prior to applying for the patent, lack of invention in the patent itself, and various other statements of defenses, which have not been seriously contended for upon the trial.

The issues were joined, and the taking of testimony was begun upon the questions of anticipation, lack of invention, and infringement; but the admitted use by the defendant of a single machine made by Chase, and practically identical with the patented device, and a number of other machines sketched in the evidence by the witness Day, which embodied all the essential elements of the Chase patent, resulted in an admission by the defendant, which is equivalent to an admission of infringement, if the patent be valid, and the complainant's rights thereto be substantiated. On the argument of the case, however, counsel for defendant has contended that these admissions were of no benefit to the complainant, in that the particular machine made by Chase had been sold by him to the defendant, at a time prior to the taking out of his patent, and that therefore they are licensees as to that machine. Further, certain differences are pointed out between the machine sketched in the Day drawings and the patent, from which the defendant attempts to argue that the Chase patent covers a different combination than that of the defendant's machines. This issue may be dismissed very briefly. The Day drawings show the machine in all essential parts like that of the Chase patent, with the substitution of a universal joint for the ball and socket joint of the patent; but the functions of both are the same, and one must be held to be an equivalent of the other.

As to the question of license for the use of the machine purchased from Chase, a valid defense might have been pleaded; but, inasmuch as

the question was not raised until the argument of the case, no distinction need be made in so far as the defense of infringement is concerned, but the testimony relating to this particular machine should be considered in mitigation of damage, as Chase, prior to the issuance of the patent, but after the making of the application, would seem to have had the right to sell a machine covered by his patent, and the question of damage would be between him and his assignee.

The testimony shows that the complainant has made a considerable use of the device described in the Chase patent. The particular purpose of the machine patented by Chase was to accomplish the routing or cutting of raised letters or numerals upon the circumference or outer surface of disks for time stamps and other manufactures of metal, where previously the trade had been compelled to use hand tools, necessarily a much slower and more expensive process. The machine described in the Chase patent may be briefly explained to be a solid upright support, carrying a knee upon which the pattern is placed, and with an arm above holding the block on which the character is to be engraved. Another arm carries a ball and socket joint, within the ball of which a shaft operates up and down through a sleeve. This shaft carries at the lower end the cutting instrument, and is also attached to a cord running over a pulley, by which a counterbalance is applied. The shaft, in the form of an arm, extends back through an opening in the upright, and, coming down and forward again, holds a pointer which can be placed in contact with the pattern, and with which the pattern is traced, while the movement of the point is reproduced on a smaller scale by the cutting instrument at the extremity of the arm. An alternative form, in which the swinging arm does not pass through the upright, but is divided into branches which unite lower down, after passing each side of the cutting tool and work, is no different in principle. The use of a properly shaped cutting tool enables, through the freedom of motion obtained from the ball and socket joint, an undercutting, and the entire arm can be raised and lowered with the aid of a counterbalance, which allows the operator to lift the tracer from the pattern, at the same time thus raising to a proportionate extent the cutting tool.

As has been said, the same elements are present in the devices used by the defendant; but, the defendant insists, in a different combination or form.

Before any examination of earlier patents, or of the condition of the art was entered into upon the trial, the whereabouts of Mallonee were ascertained, and he was produced as a witness. He immediately claimed to be the inventor of the device patented by Chase, and the first issue considered was therefore whether the patent in suit was invalid, in that it had not been taken out by the original inventor. The testimony upon this point has been substantially recited above. It is extremely unfortunate that such an issue could not be tried before the court, as the witnesses themselves should be listened to in order to give true weight to the testimony. The evidence seems to explain the complainant's failure to produce Chase, while the bitter feeling shown throughout the statements of most of the witnesses leads the court to

conclude that, after such a length of time, and after such disputes and disagreements as are testified to in connection with the different parties thereto, taking into account his failure to secure a patent even when building a similar machine, it does not seem that the defendant has proven with sufficient certainty that the patent was not rightfully taken out by Chase. Mallonee in one place testified that in October, 1892, when he made the Stewart machines, he had heard that Chase had procured a patent, but Chase's application was not filed until the following year; yet Mallonee did not interfere, nor had he made any effort to obtain a patent, which he says was valuable, for himself. Further, the sale of wheels bearing figures cut by a machine may show the output of a product more than two years prior to the application; but the testimony shows that whatever use was made by the New York Stencil Works was secret, in so far as the machine itself was concerned. Experiments were being made, but the testimony does not seem to conclusively prove public use on the part of any person for so long a period as two years previous to the summer of 1893, when the application was filed. As Mallonee left in July, 1891, and certainly had drawings or knew of the machine before leaving, there can be no doubt of the existence of the machine for the two years; but a public use was evidently avoided. As to the defenses of anticipation and the progress of the prior art, as shown by the testimony, a long discussion is unnecessary, in the view which is taken by the court of the patents put in evidence.

The prior inventions which have been set up by the defendant, and which are included in the record, fall immediately into separate classes: First, those embodying merely the qualities of a pantograph, such as the patent to Ware, No. 190,797, issued May 15, 1877, and to Allen, No. 11,922, issued November 14, 1854. It must be noted that the Ware patent contained the principles of a ball and socket joint, and of the sleeve to allow of the vertical movement of the tracer; but the Ware patent was confined to a drawing pencil for tracing designs, while in the Allen patent the idea of the pantograph or of the tracer, which was later on used by Chase, was applied to the carving of marble or stone, and provided for vertical as well as horizontal movement, by the combination of two pantographs, one horizontal and one vertical.

The second class of patents shows a development in the application of the pantograph principle to engraving machines, and in the Engle patent, No. 246,737, September 6, 1881, and his later patent of April 10, 1883, No. 275,618; and in the Moore patent, No. 387,595, August 7, 1888, many well-known ideas, which are also made use of in the Chase patent under consideration, were combined in differing combinations to produce an engraving machine which would follow copy and operate over different surfaces and different levels.

The third class of patents applied the same idea of the pantograph to the functions of carving metal, wood, and stone, and included in this class of patents we find the S. F. Moore patent, No. 384,995, June 26, 1888; No. 409,695, August 27, 1889; No. 394,710, December 18, 1888; the Luce patent of August 4, 1874, No. 153,836; the Hun-

zinger, No. 463,836, November 24, 1891; and, in a sense, the Allen patent, No. 11,922, November 14, 1854, previously mentioned.

A still different class of machines, and in some respects closely related to the patent in suit, was that invented by Benton, issued December 22, 1885, No. 332,990.

Benton's specifications and drawings show a tool for cutting type-punches, in which he has a swinging-frame, suspended by a universal joint, working on a fixed standard, which swinging-frame carried a pointer for tracing the pattern, and a rotating-cutter in said swinging-frame, supported by the universal joint, and with holders attached to the fixed standard for the pattern, and also for the block to be cut. The latter support also carrying the universal joint by which the oscillating arm is swung. The defendant's device, represented by the Day sketch, resembles this Benton machine more closely even than does' the Chase patent, in that the connection used is a universal joint, rather than a ball and socket construction with a sleeve; but in the Benton machine the entire weight of the oscillating arm and its appliances rests upon the pattern, while the cutting tool is located on the under side or below the block to be cut, which necessitates adjustment, and a holding of the work against the cutter, and of the pointer against the pattern, by means of a spring at the top of the arm. The freedom of motion and ease of operation provided by the use of a counterbalance and of the sleeve, found in the Chase machine and the defendant's device, are not present; and although Benton provides that he may change the relative position of the work and the tool, making the work stationary and the cutting tool movable, he does not show a combination of the different elements covering the application of all those elements which are found in the claims of the Chase patent.

The same thing is true of all of the patents which have been recited. Nearly every idea made use of in the Chase patent can separately be traced from some other patent, with the exception of the principle of the counterbalance; but the Chase patent is shown to be useful and practicable, the combination of these elements is an advance over any one of the others, and no one of the others would disclose or teach the precise relative union of means for accomplishing the ends desired, without combining elements which had never previously been joined for such a purpose in any one machine. As has been said, the Benton machine may more nearly combine a number of these ideas, and it may have been a shorter step from that patent to the Chase than from any of the others; but there are certain defects in the Benton machine which have been obviated in the Chase patent, and the practical application of a combination which will remedy these defects seems to the court to be original with Chase and to be worthy of protection by a patent.

The defendant has caused to be built a number of machines in which these same difficulties have been removed in the same or an equivalent manner. The ball and socket joint with the sleeve is neither improved upon nor is any new combination shown by using the principle of a universal joint. No difference lies in the fact that the patent in suit lifts by the counterbalance the entire swinging arm, including the ball

and socket joint, while the defendant's machine lifts the swinging arm by means of the support forming a part of the universal joint itself. The device of Chase, set forth in the fourth claim of his patent, would seem to be infringed, and to have been a patentable novelty at the time the patent was issued.

Claims 1, 2, and 3 might with much more reason be held to have been anticipated by the patents above referred to, and claims 5, 6, 7, and 8 add nothing to the principles of the device set forth in claim 4, so far as the questions arising between the complainant's and defendant's machines are concerned.

The complainant therefore may have a decree, based upon claim 4, of its patent, and also an injunction with reference to the alternate form of construction of the swinging or tracer arm, as described in claim 3, where said arm is stated to extend "down behind the standard and forward through said opening therein," the two constructions being substantially equivalent, and both being properly within the principles of the combination used by the defendant, although the precise form of the defendant's machine cannot be held to infringe the language of claim 3, just quoted, and hence no damage thereby has been proven or can be awarded on that claim.